# TAMPA ELECTRIC CO. *v.* NASHVILLE COAL CO. ET AL.

No. 87. Argued December 15, 1960.—Decided February 27, 1961.

*William C. Chanler* argued the cause and filed a brief for petitioner.

*Abe Fortas* argued the cause for respondents. With him on the brief was *Norman Diamond.*

MR. JUSTICE CLARK delivered the opinion of the Court.

We granted certiorari to review a declaratory judgment holding illegal under § 3 of the Clayton Act[1] a requirements contract between the parties providing for the purchase by petitioner of all the coal it would require as boiler fuel at its Gannon Station in Tampa, Florida, over a 20-year period. 363 U. S. 836. Both the District Court, 168 F. Supp. 456, and the Court of Appeals, 276 F. 2d 766, Judge Weick dissenting, agreed with respondents that the contract fell within the proscription of § 3 and therefore was illegal and unenforceable. We cannot agree that the contract suffers the claimed antitrust illegality[2] and, therefore, do not find it necessary to

---

[1] "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods . . . for use, consumption, or resale within the United States . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U. S. C. § 14.

[2] In addition to their claim under § 3 of the Clayton Act, respondents argue the contract is illegal under the Sherman Act, 15 U. S. C. §§ 1-2.

consider respondents' additional argument that such illegality is a defense to the action and a bar to enforceability.

*The Facts.*

Petitioner Tampa Electric Company is a public utility located in Tampa, Florida. It produces and sells electric energy to a service area, including the city, extending from Tampa Bay eastward 60 miles to the center of the State, and some 30 miles in width. As of 1954 petitioner operated two electrical generating plants comprising a total of 11 individual generating units, all of which consumed oil in their burners. In 1955 Tampa Electric decided to expand its facilities by the construction of an additional generating plant to be comprised ultimately of six generating units, and to be known as the "Francis J. Gannon Station." Although every electrical generating plant in peninsular Florida burned oil at that time, Tampa Electric decided to try coal as boiler fuel in the first two units constructed at the Gannon Station. Accordingly, it contracted with the respondents [3] to furnish the expected coal requirements for the units. The agreement, dated May 23, 1955, embraced Tampa Electric's "total requirements of fuel . . . for the operation of its first two units to be installed at the Gannon Station . . . not less than 225,000 tons of coal per unit per year," for a period of 20 years. The contract further provided that "if during the first 10 years of the term . . . the Buyer constructs additional units [at Gannon] in which coal is used as the fuel, it shall give the Seller notice thereof two years prior to the completion of such unit or units and upon completion of same the fuel requirements thereof shall be added to this contract." It was understood and agreed, however, that "the Buyer has the option to be exercised two years prior

---

[3] The original contract was with Potter Towing Company, and by subsequent agreements with Tampa Electric responsibility thereunder was assumed by respondent West Kentucky Coal Company.

to completion of said unit or units of determining whether coal or some other fuel shall be used in same." Tampa Electric had the further option of reducing, up to 15%, the amount of its coal purchases covered by the contract after giving six months' notice of an intention to use as fuel a by-product of any of its local customers. The minimum price was set at $6.40 per ton delivered, subject to an escalation clause based on labor cost and other factors. Deliveries were originally expected to begin in March 1957, for the first unit, and for the second unit at the completion of its construction.

In April 1957, soon before the first coal was actually to be delivered and after Tampa Electric, in order to equip its first two Gannon units for the use of coal, had expended some $3,000,000 more than the cost of constructing oil-burning units, and after respondents had expended approximately $7,500,000 readying themselves to perform the contract, the latter advised petitioner that the contract was illegal under the antitrust laws, would therefore not be performed, and no coal would be delivered. This turn of events required Tampa Electric to look elsewhere for its coal requirements. The first unit at Gannon began operating August 1, 1957, using coal purchased on a temporary basis, but on December 23, 1957, a purchase order contract for the total coal requirements of the Gannon Station was made with Love and Amos Coal Company. It was for an indefinite period cancellable on 12 months' notice by either party, or immediately upon tender of performance by respondents under the contract sued upon here. The maximum price was $8.80 per ton, depending upon the freight rate. In its purchase order to the Love and Amos Company, Tampa estimated that its requirements at the Gannon Station would be 350,000 tons in 1958; 700,000 tons in 1959 and 1960; 1,000,000 tons in 1961; and would increase thereafter, as required, to "about 2,250,000 tons per year." The second unit at Gannon

Station commenced operation 14 months after the first, *i. e.*, October 1958. Construction of a third unit, the coal for which was to have been provided under the original contract, was also begun.

The record indicates that the total consumption of coal in peninsular Florida, as of 1958, aside from Gannon Station, was approximately 700,000 tons annually. It further shows that there were some 700 coal suppliers in the producing area where respondents operated, and that Tampa Electric's anticipated maximum requirements at Gannon Station, *i. e.*, 2,250,000 tons annually, would approximate 1% of the total coal of the same type produced and marketed from respondents' producing area.

Petitioner brought this suit in the District Court pursuant to 28 U. S. C. § 2201, for a declaration that its contract with respondents was valid, and for enforcement according to its terms. In addition to its Clayton Act defense, respondents contended that the contract violated both §§ 1 and 2 of the Sherman Act which, it claimed, likewise precluded its enforcement. The District Court, however, granted respondents' motion for summary judgment on the sole ground that the undisputed facts, recited above, showed the contract to be a violation of § 3 of the Clayton Act. The Court of Appeals agreed. Neither court found it necessary to consider the applicability of the Sherman Act.

## Decisions of District Court and Court of Appeals.

Both courts admitted that the contract "does not expressly contain the 'condition'" that Tampa Electric would not use or deal in the coal of respondents' competitors. Nonetheless, they reasoned, the "total requirements" provision had the same practical effect, for it prevented Tampa Electric for a period of 20 years from buying coal from any other source for use at that station. Each court cast aside as "irrelevant" arguments citing the

use of oil as boiler fuel by Tampa Electric at its other stations, and by other utilities in peninsular Florida, because oil was not in fact used at Gannon Station, and the possibility of exercise by Tampa Electric of the option reserved to it to build oil-burning units at Gannon was too remote. Found to be equally remote was the possibility of Tampa's conversion of existing oil-burning units at its other stations to the use of coal which would not be covered by the contract with respondents. It followed, both courts found, that the "line of commerce" on which the restraint was to be tested was coal—not boiler fuels. Both courts compared the estimated coal tonnage as to which the contract pre-empted competition for 20 years, namely, 1,000,000 tons a year by 1961, with the previous annual consumption of peninsular Florida, 700,000 tons. Emphasizing that fact as well as the contract value of the coal covered by the 20-year term, i. e., $128,000,000, they held that such volume was not "insignificant or insubstantial" and that the effect of the contract would "be to substantially lessen competition," in violation of the Act. Both courts were of the opinion that in view of the executory nature of the contract, judicial enforcement of any portion of it could not be granted without directing a violation of the Act itself, and enforcement was, therefore, denied.[4]

*Application of § 3 of the Clayton Act.*

In the almost half century since Congress adopted the Clayton Act, this Court has been called upon 10 times,[5] including the present, to pass upon questions arising under § 3. *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346 (1922), the first of the cases, held that

---

[4] Cf. *Kelly* v. *Kosuga,* 358 U. S. 516.

[5] For discussion of previous cases, see *Standard Oil Co.* v. *United States,* 337 U. S. 293, 300–305.

the Act "sought to reach the agreements embraced within
its sphere in their incipiency, and in the section under
consideration to determine their legality by specific tests
of its own. . . ." At p. 356. In sum, it was declared, § 3
condemned sales or agreements "where the effect of such
sale or contract . . . would under the circumstances dis-
closed probably lessen competition, or create an actual
tendency to monopoly." At pp. 356–357. This was not
to say, the Court emphasized, that the Act was intended
to reach every "remote lessening" of competition—only
those which were substantial—but the Court did not draw
the line where "remote" ended and "substantial" began.
There in evidence, however, was the fact that the activities
of two-fifths of the Nation's 52,000 pattern agencies were
affected by the challenged device. Then, one week later,
followed *United Shoe Machinery Corp.* v. *United States,*
258 U. S. 451 (1922), which held that even though a con-
tract does "not contain specific agreements not to use the
[goods] of a competitor," if "the practical effect . . . is
to prevent such use," it comes within the condition of the
section as to exclusivity. At p. 457. The Court also
held, as it had in *Standard Fashion, supra,* that a finding
of domination of the relevant market by the lessor or
seller was sufficient to support the inference that com-
petition had or would be substantially lessened by the
contracts involved there. As of that time it seemed
clear that if "the practical effect" of the contract was
to prevent a lessee or buyer from using the products
of a competitor of the lessor or seller and the con-
tract would thereby probably substantially lessen com-
petition in a line of commerce, it was proscribed. A
quarter of a century later, in *International Salt Co.* v.
*United States,* 332 U. S. 392 (1947), the Court held, at
least in tying cases, that the necessity of direct proof of
the economic impact of such a contract was not necessary
where it was established that "the volume of business

affected" was not "insignificant or insubstantial" and that the effect was "to foreclose competitors from any substantial market." At p. 396. It was only two years later, in *Standard Oil Co.* v. *United States,* 337 U. S. 293 (1949), that the Court again considered § 3 and its application to exclusive supply or, as they are commonly known, requirements contracts. It held that such contracts are proscribed by § 3 if their practical effect is to prevent lessees or purchasers from using or dealing in the goods, etc., of a competitor or competitors of the lessor or seller and thereby "competition has been foreclosed in a substantial share of the line of commerce affected." At p. 314.

In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected. Following the guidelines of earlier decisions, certain considerations must be taken. *First,* the line of commerce, *i. e.,* the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case.[6] *Second,* the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies. In short, the threatened foreclosure of competition must be in relation to the market affected. As was said in *Standard Oil Co.* v. *United States, supra:*

"It is clear, of course, that the 'line of commerce' affected need not be nationwide, at least where the purchasers cannot, as a practical matter, turn to suppliers outside their own area. Although the effect on

[6] See *International Boxing Club* v. *United States,* 358 U. S. 242.

competition will be quantitatively the same if a given volume of the industry's business is assumed to be covered, whether or not the affected sources of supply are those of the industry as a whole or only those of a particular region, a purely quantitative measure of this effect is inadequate because the narrower the area of competition, the greater the comparative effect on the area's competitors. Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition." At p. 299, note 5.

In the *Standard Oil* case, the area of effective competition—the relevant market—was found to be where the seller and some 75 of its competitors sold petroleum products. Conveniently identified as the Western Area, it included Arizona, California, Idaho, Nevada, Oregon, Utah and Washington. Similarly, in *United States* v. *Columbia Steel Co.,* 334 U. S. 495 (1948), a § 1 Sherman Act case, this Court decided the relevant market to be the competitive area in which Consolidated marketed its products, *i. e.,* 11 Western States. The Court found Consolidated's share of the nationwide market for the relevant line of commerce, rolled steel products, to be less than ½ of 1%, an "insignificant fraction of the total market," at p. 508; and its share of the more narrow but only relevant market, 3%, was described as "a small part," at p. 511, not sufficient to injure any competitor of United States Steel in that area or elsewhere.

*Third,* and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited as was pointed out in *Standard Oil Co.* v. *United States, supra.* There the impact of the requirements contracts was studied in the setting of the large number of gasoline stations—5,937 or

16% of the retail outlets in the relevant market—and the large number of contracts, over 8,000, together with the great volume of products involved. This combination dictated a finding that "Standard's use of the contracts [created] just such a potential clog on competition as it was the purpose of § 3 to remove" where, as there, the affected proportion of retail sales was substantial. At p. 314. As we noted above, in *United States* v. *Columbia Steel Co., supra,* substantiality was judged on a comparative basis, *i. e.,* Consolidated's use of rolled steel was "a small part" when weighed against the total volume of that product in the relevant market.

To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.

*The Application of § 3 Here.*

In applying these considerations to the facts of the case before us, it appears clear that both the Court of Appeals and the District Court have not given the required effect to a controlling factor in the case—the relevant competitive market area. This omission, by itself, requires reversal, for, as we have pointed out, the relevant market is the prime factor in relation to which the ultimate question, whether the contract forecloses competition in a substantial share of the line of commerce involved, must be decided. For the purposes of this case, therefore, we need not decide two threshold questions pressed by Tampa

Electric. They are whether the contract in fact satisfies the initial requirement of § 3, *i. e.,* whether it is truly an exclusive-dealing one, and, secondly, whether the line of commerce is boiler fuels, including coal, oil and gas, rather than coal alone.[7] We, therefore, for the purposes of this case, assume, but do not decide, that the contract is an exclusive-dealing arrangement within the compass of § 3, and that the line of commerce is bituminous coal.

*Relevant Market of Effective Competition.*

Neither the Court of Appeals nor the District Court considered in detail the question of the relevant market. They do seem, however, to have been satisfied with inquiring only as to competition within "Peninsular Florida." It was noted that the total consumption of peninsular Florida was 700,000 tons of coal per year, about equal to the estimated 1959 requirements of Tampa Electric. It was also pointed out that coal accounted for less than 6% of the fuel consumed in the entire State.[8] The District Court concluded that though the respondents were only one of 700 coal producers who could serve the same market, peninsular Florida, the contract for a period of 20 years excluded competitors from a substantial

---

[7] In support of these contentions petitioner urges us to consider that it remains free to convert existing oil-burning units at its other plants to coal-burning units, the fuel for which it would be free to purchase from any seller in the market; also that just as it is permitted to use oil at its other plants, so, too, it may construct all future Gannon units as oil burners; and that in any event it is free to draw a maximum of 15% of its Gannon fuel requirements from by-products of local customers. Petitioner further argues that its novel reliance upon coal in fact created new fuel competition in an area that theretofore relied almost exclusively upon oil and, to a lesser extent, upon natural gas.

[8] Oil and, to a lesser extent, natural gas are the primary fuels consumed in Florida.

amount of trade. Respondents contend that the coal tonnage covered by the contract must be weighed against either the total consumption of coal in peninsular Florida, or all of Florida, or the Bituminous Coal Act area comprising peninsular Florida and the Georgia "finger," or, at most, all of Florida and Georgia. If the latter area were considered the relevant market, Tampa Electric's proposed requirements would be 18% of the tonnage sold therein. Tampa Electric says that both courts and respondents are in error, because the "700 coal producers who could serve" it, as recognized by the trial court and admitted by respondents, operated in the Appalachian coal area and that its contract requirements were less than 1% of the total marketed production of these producers; that the relevant effective area of competition was the area in which these producers operated, and in which they were willing to compete for the consumer potential.

We are persuaded that on the record in this case, neither peninsular Florida, nor the entire State of Florida, nor Florida and Georgia combined constituted the relevant market of effective competition. We do not believe that the pie will slice so thinly. By far the bulk of the overwhelming tonnage marketed from the same producing area as serves Tampa is sold outside of Georgia and Florida, and the producers were "eager" to sell more coal in those States.[9] While the relevant competitive market is not ordinarily susceptible to a "metes and bounds" definition, cf. *Times-Picayune Pub. Co.* v. *United States*, 345 U. S. 594, 611, it is of course the area in which respondents

---

[9] Peabody Coal Company offered to supply petitioner with coal from its mines in western Kentucky, for use in the units at another of its Florida stations, and that offer prompted a renegotiation of the price petitioner was paying for the oil then being consumed at that station.

332

and the other 700 producers effectively compete. *Standard Oil Co.* v. *United States, supra.* The record shows that, like the respondents, they sold bituminous coal "suitable for [Tampa's] requirements," mined in parts of Pennsylvania, Virginia, West Virginia, Kentucky, Tennessee, Alabama, Ohio and Illinois. We take notice of the fact that the approximate total bituminous coal (and lignite) product in the year 1954 from the districts in which these 700 producers are located was 359,289,000 tons, of which some 290,567,000 tons were sold on the open market.[10] Of the latter amount some 78,716,000 tons were sold to electric utilities.[11] We also note that in 1954 Florida and Georgia combined consumed at least 2,304,000 tons, 1,100,000 of which were used by electric utilities, and the sources of which were mines located in no less than seven States.[12] We take further notice that the production and marketing of bituminous coal (and lignite) from the same districts, and assumedly equally available to Tampa on a commercially feasible basis, is currently on a par with prior years.[13] In point of statistical fact, coal consumption in the combined Florida-Georgia area has increased significantly since 1954. In 1959 more than 3,775,000 tons were there consumed, 2,913,000 being used by electric utilities including, presumably, the coal used by the petitioner.[14]

[10] U. S. Bureau of the Census. I U. S. Census of Mineral Industries: 1954, Series: MI–12B, p. 4 (1957).

[11] *Id.,* at 12B–6.

[12] 1,569,000 tons from counties in West Virginia, Virginia, Kentucky, Tennessee and North Carolina; 412,000 tons from counties in Alabama, Georgia and Tennessee; the balance was produced in other counties in West Virginia, Virginia and western Kentucky. *Id.,* at 12B–10.

[13] United States Dept. of Interior, Bureau of Mines, II Minerals Yearbook (Fuels), 1959.

[14] United States Dept. of Interior, Bureau of Mines, Mineral Market Report, M. M. S. No. 3035, p. 23 (1960). These statistics were taken from sources cited by respondents.

The coal continued to come from at least seven States.[15] From these statistics it clearly appears that the proportionate volume of the total relevant coal product as to which the challenged contract pre-empted competition, less than 1%, is, conservatively speaking, quite insubstantial. A more accurate figure, even assuming pre-emption to the extent of the maximum anticipated total requirements, 2,250,000 tons a year, would be .77%.

*Effect on Competition in the Relevant Market.*

It may well be that in the context of antitrust legislation protracted requirements contracts are suspect, but they have not been declared illegal *per se.* Even though a single contr ıct between single traders may fall within the initial broad proscription of the section, it must also suffer the qualifying disability, tendency to work a substantial—not remote—lessening of competition in the relevant competitive market. It is urged that the present contract pre-empts competition to the extent of purchases worth perhaps $128,000,000,[16] and that this

---

[15] 1,787,000 tons from certain counties in West Virginia, Virginia, Kentucky, Tennessee and North Carolina; 1,321,000 tons from counties in Alabama, Georgia and elsewhere in Tennessee; 665,000 tons from the western Kentucky fields; 2,000 tons from other counties in West Virginia and Virginia. *Ibid.*

[16] In this connection we note incidentally that in *Appalachian Coals, Inc.*, v. *United States*, 288 U. S. 344, 369 (1933), cited by respondents, Chief Justice Hughes quoted testimony showing that in 1932 it was nothing those days "for one interest or one concern to buy several million tons of coal." At n. 7. The findings of the District Court showed that one utility consumed 2,485,000 tons of coal a year. Other concerns had requirements running from 30,000 to 250,000 tons annually, while a textile manufacturer used 600,000 tons. At p. 370, n. 8. The Chief Justice also stated in his opinion that, within 24 counties in Kentucky, Tennessee (in both of which respondents operate) and their competitive States of Virginia and West Virginia, "there are over 1,620,000 acres of coal bearing land, containing approximately 9,000,000,000 net tons of recoverable coal . . . ." At p. 369.

334

"is, of course, not insignificant or insubstantial." While $128,000,000 is a considerable sum of money, even in these days, the dollar volume, by itself, is not the test, as we have already pointed out.

The remaining determination, therefore, is whether the pre-emption of competition to the extent of the tonnage involved tends to substantially foreclose competition in the relevant coal market. We think not. That market sees an annual trade in excess of 250,000,000 tons of coal and over a billion dollars—multiplied by 20 years it runs into astronomical figures. There is here neither a seller with a dominant position in the market as in *Standard Fashions, supra;* nor myriad outlets with substantial sales volume, coupled with an industry-wide practice of relying upon exclusive contracts, as in *Standard Oil, supra;* nor a plainly restrictive tying arrangement as in *International Salt, supra.* On the contrary, we seem to have only that type of contract which "may well be of economic advantage to buyers as well as to sellers." *Standard Oil Co.* v. *United States, supra,* at p. 306. In the case of the buyer it "may assure supply," while on the part of the seller it "may make possible the substantial reduction of selling expenses, give protection against price fluctuations, and . . . offer the possibility of a predictable market." *Id.,* at 306–307. The 20-year period of the contract is singled out as the principal vice, but at least in the case of public utilities the assurance of a steady and ample supply of fuel is necessary in the public interest. Otherwise consumers are left unprotected against service failures owing to shutdowns; and increasingly unjustified costs might result in more burdensome rate structures eventually to be reflected in the consumer's bill. The compelling validity of such considerations has been recognized fully in the natural gas public utility field. This is not to say that utilities are immunized from Clayton Act proscriptions, but merely that, in judging the term

of a requirements contract in relation to the substantiality of the foreclosure of competition, particularized considerations of the parties' operations are not irrelevant. In weighing the various factors, we have decided that in the competitive bituminous coal marketing area involved here the contract sued upon does not tend to foreclose a substantial volume of competition.

We need not discuss the respondents' further contention that the contract also violates § 1 and § 2 of the Sherman Act, for if it does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the former. *Times-Picayune Pub. Co.* v. *United States, supra,* at pp. 608–609.

The judgment is reversed and the case remanded to the District Court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS are of the opinion that the District Court and the Court of Appeals correctly decided this case and would therefore affirm their judgments.